# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE HOMEFED CORPORATION STOCKHOLDER LITIGATION | ) ) ) ) | CONSOLIDATED C.A. No. 2019-0592-AGB |

## MEMORANDUM OPINION

Date Submitted: April 3, 2020
Date Decided: July 13, 2020

Peter B. Andrews, Craig J. Springer, and David M. Sborz, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Ned Weinberger, LABATON SUCHAROW LLP, Wilmington, Delaware; Jeremy S. Friedman and David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; John Vielandi and David MacIsaac, LABATON SUCHAROW LLP, New York, New York; D. Seamus Kaskela, KASKELA LAW LLC, Newtown Square, Pennsylvania; *Attorneys for Plaintiffs Richard Rose and Dennis E. Murray Sr.*

S. Mark Hurd and Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; John P. Stigi III, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, Los Angeles, California; Kristin P. Housh, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, San Diego, California; *Attorneys for Defendants Patrick Bienvenue and Paul Borden*.

Bradley R. Aronstam and S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Joseph S. Allerhand, Evert J. Christensen Jr. and Elizabeth M. Sytsma, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Attorneys for Defendants Brian Friedman, Jimmy Hallac, Joseph Steinberg, and Jefferies Financial Group Inc.*

**BOUCHARD, C**

This case concerns a transaction in which Jefferies Financial Group Inc., the 70% stockholder of HomeFed Corporation, acquired the rest of the shares of the company in July 2019 by exchanging two of its shares for each share of HomeFed held by its minority stockholders. The transaction traces its roots back to 2017, when a HomeFed director proposed that Jefferies take HomeFed private in a 2:1 share exchange. In December 2017, a special committee of HomeFed's board of directors was put in place to negotiate with Jefferies. The special committee paused its process in March 2018, when Jefferies told the special committee it was no longer interested in pursuing the transaction.

Over the next eleven months, despite indicating a lack of interest in a transaction, Jefferies engaged in direct discussions concerning a potential transaction with HomeFed's largest minority stockholder (BMO), whose support was essential to get a deal done with the approval of the minority stockholders. In early February 2019, BMO indicated to Jefferies that it would support a 2:1 share exchange. Shortly thereafter, Jefferies formally proposed acquiring the rest of HomeFed's shares in a 2:1 share exchange conditioned on obtaining the approval of a special committee and a majority of the minority stockholders. After some back and forth, the reactivated special committee ultimately approved the 2:1 share exchange that Jefferies originally proposed.

1

Plaintiffs are former stockholders of HomeFed. Their complaint asserts claims for breach of fiduciary duty against HomeFed's directors and Jefferies as its controlling stockholder. All of the defendants moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.

The primary issue before the court is whether the transaction complied with the framework set forth in *Kahn v. M & F Worldwide Corp.* ("*MFW*")[1] for subjecting a squeeze-out merger by a controlling stockholder to business judgment review rather than the entire fairness standard. Plaintiffs argue there are several reasons it did not. For the reasons explained below, the court concludes that the complaint pleads a reasonably conceivable set of facts that the transaction did not satisfy the requirements of *MFW*. This is because, according to the complaint, Jefferies did not commit itself to the dual protections of *MFW* before engaging in substantive economic discussions concerning the transaction that anchored later negotiations and undermined the ability of the special committee to bargain effectively on behalf of the minority stockholders. The court also concludes that the complaint states non-exculpated claims against two of the directors who were not affiliated with Jefferies at the time of the transaction. Accordingly, defendants' motions to dismiss will be denied.

---

[1] 88 A.3d 635 (Del. 2014).

## I.   BACKGROUND

Unless otherwise noted, the facts recited in this opinion come from the allegations of the Verified Class Action Complaint ("Complaint") and documents incorporated therein.[2]  Any additional facts are subject to judicial notice.

### A.   The Parties

Plaintiffs Richard Rose and Dennis E. Murray, Sr. (together, "Plaintiffs") each held shares of stock of HomeFed Corporation ("HomeFed" or the "Company") at all times relevant to the buyout transaction at issue in this action (the "Transaction").[3]

HomeFed is a Delaware corporation engaged in the development and ownership of residential and mixed-use real estate projects in California, Virginia, South Carolina, Florida, Maine, and New York.[4]

The Complaint names as defendants Jefferies Financial Group Inc. ("Jefferies") and the seven members of HomeFed's board of directors (the "Board") when the Transaction was approved:  Joseph Steinberg, Brian Friedman, Jimmy Hallac, Patrick Bienvenue, Paul Borden, Timothy Considine, and Michael Lobatz. Three of these individuals (Steinberg, Friedman, and Hallac) held senior positions

---

[2] Verified Compl. ("Compl.") (Dkt. 1).  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

[3] Compl. ¶ 16.

[4] *Id.* ¶ 26.

at Jefferies and were not "independent" under Nasdaq listing rules.[5] Together with Jefferies, these three individuals are referred to collectively as the "Jefferies Defendants."

Jefferies, formerly known as Leucadia National Corporation, is a diversified holding company with an array of businesses and investments.[6] As of the closing of the Transaction, Jefferies owned an aggregate of 10,853,123 shares of HomeFed stock, or approximately 70% of the Company's common stock.[7]

Steinberg served on the Board since 1998 and as Chairman of the Board since 1999.[8] Steinberg is also Chairman of Jefferies' board of directors, served as Jefferies' President from January 1979 until March 2013, and serves as a director of Jefferies Group LLC, a wholly-owned subsidiary of Jefferies.[9]

Friedman served on the Board since April 2014.[10] Friedman has served on Jefferies' board of directors since March 2013 and succeeded Steinberg as President in March 2013.[11] Friedman also has been a director and executive officer of Jefferies

---

[5] *Id.* ¶¶ 17-19 (citing HomeFed's definitive proxy statement filed with the Securities and Exchange Commission on June 28, 2018).

[6] *Id.* ¶ 24.

[7] *Id.* ¶¶ 24, 31.

[8] *Id.* ¶ 17.

[9] *Id.*

[10] *Id.* ¶ 18.

[11] *Id.*

Group LLC and served as Chairman of its Executive Committee since 2002, along with serving on several boards of subsidiaries and investee companies of Jefferies Group.[12]

Hallac served on the Board since March 2017.[13] Hallac has been employed at Jefferies since 2002 and currently serves as managing director.[14] He also serves on the boards of various Jefferies' portfolio entities.[15]

Considine and Lobatz, who joined the Board in 1992 and 1995, respectively, served on a special committee tasked to negotiate the terms of the Transaction (the "Special Committee").[16] The remaining two directors, Bienvenue and Borden, both joined the Board in May 1998.[17]

## B.    The Stockholders Agreement

In 1998, Leucadia spun-off HomeFed to its stockholders.[18] In 2014, after Leucadia merged with Jefferies the year before, Jefferies increased its ownership of HomeFed from approximately 31% to approximately 65% of HomeFed's

---

[12] *Id.*

[13] *Id.* ¶ 19.

[14] *Id.*

[15] *Id.*

[16] *Id.* ¶¶ 22-23, 37.

[17] *Id.* ¶¶ 20-21.

[18] *Id.* ¶ 28.

outstanding shares.[19] In connection with that transaction, Jefferies and HomeFed entered into a Stockholders Agreement.[20]

In the Stockholders Agreement, Jefferies agreed it "shall not directly or indirectly" acquire "additional securities of the Company" (i) without the prior approval of a special committee of "Independent Directors" and (ii) "if the proposed transaction is subject to Rule 13e-3 under the Exchange Act," without obtaining "the affirmative vote of a majority of the Outstanding Voting Securities held by the Disinterested Stockholders."[21]

## C. The Considine Letter

On September 26, 2017, Considine wrote a letter to Steinberg proposing a potential merger of HomeFed and Jefferies with a 2:1 exchange ratio (*i.e.*, two Jefferies shares for each HomeFed share), which implied a price of $50 per each share of HomeFed (the "Considine Letter").[22] Shortly after receiving the Considine Letter, Steinberg, acting on behalf of Jefferies, reached out to a portfolio manager at Beck, Mack and Oliver, LLC ("BMO") to discuss a potential HomeFed-Jefferies

---

[19] *Id.* ¶¶ 29-30.

[20] *Id.* ¶ 30. The Stockholders Agreement was entered into under Jefferies' former name, Leucadia National Corporation. Transmittal Affidavit of Bradley R. Aronstam ("Aronstam Aff.") Ex. E ("Stockholders Agreement") Preamble (Dkt. 24).

[21] Stockholders Agreement § 3.

[22] Compl. ¶ 34.

merger.[23] At the time, BMO was HomeFed's largest stockholder behind Jefferies, owning approximately 9% of HomeFed's common stock, or approximately 36% of the shares unaffiliated with Jefferies.[24] Discussions with BMO did not progress because its thoughts on an appropriate exchange ratio were very different from those of Jefferies.[25]

In December 2017, Considine and Lobatz wrote a letter alerting the Board that "[a] discussion has taken place concerning the feasibility of having a stock transaction merging HomeFed into [Jefferies]" and requesting, "as the only independent directors" on the Board, to be appointed "to investigate a potential stock transaction acting as an independent Special Committee."[26] On December 11, 2017, the Board adopted resolutions (the "December 2017 Resolutions") expanding the authority of a previously created committee consisting of Considine and Lobatz (as defined above, the "Special Committee") to include:

> the exclusive power and authority (1) to review, evaluate and propose the terms and conditions, and determine the advisability of a Potential Transaction and any other alternative transactions, (2) to communicate and negotiate (or to direct communications and negotiations) with any other party that the Special Committee of Independent Directors deems appropriate with respect to the terms and conditions, or the

---

[23] *Id.* ¶ 35.

[24] *Id.*; Aronstam Aff. Ex. F (May 20, 2019 Definitive Proxy Statement of HomeFed filed on Schedule 14A) ("Proxy"), at 106-07; Aronstam Aff. Ex. G (Apr. 12, 2019 Presentation), at -0238.

[25] Compl. ¶ 35.

[26] *Id.* ¶ 37.

implementation, of a Potential Transaction and any other alternative transactions, . . . [and] (7) to communicate with the full Board, the stockholders and other parties to a Potential Transaction and any further alternatives.[27]

The December 2017 Resolutions further provided that "the officers of [HomeFed] are hereby directed not to have or direct any negotiations or related material communications with any other party to a Potential Transaction . . . unless a Chairman of the Special Committee of Independent Directors has approved of or is present at such communications or negotiations."[28]

In January 2018, the Special Committee engaged Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin") as "Special Counsel" to the Company for a potential strategic transaction with Jefferies and engaged Seltzer Caplan McMahon Vitek and Morris, Nichols, Arsht & Tunnell LLP as its counsel.[29] The Special Committee also selected Houlihan Lokey as its financial advisor but did not formally engage the firm at that time.[30]

---

[27] *Id.* ¶ 38 (quoting Aronstam Aff. Ex. I ("December 2017 Resolutions")).

[28] *Id.* ¶ 39 (same).

[29] *Id.* ¶ 42.

[30] *Id.*

### D. Jefferies Pauses Negotiations with the Special Committee While Continuing to Communicate with HomeFed Stockholders

On March 15, 2018, Hallac emailed Sheppard Mullin on behalf of Jefferies to communicate that Jefferies no longer wanted to pursue a strategic transaction.[31] Around this time, HomeFed's stock was trading around $55 per share while Jefferies' stock was trading at around $24 per share.[32] With the proposed 2:1 exchange ratio, this translated to an approximately 13% negative premium for HomeFed stockholders.

On March 26, 2018, the Special Committee determined to "pause" its process of exploring a potential transaction.[33] Although paused on the Special Committee's end, Jefferies "repeatedly" held discussions with BMO from March 2018 through February 2019 about a potential transaction in which Jefferies would acquire the remaining shares of HomeFed that it did not already own.[34] These discussions did not progress because "BMO and Jefferies were too far apart with respect to an appropriate exchange ratio."[35] This changed in early February 2019. As explained in the Proxy:

---

[31] *Id.* ¶ 45.

[32] *Id.* ¶ 44.

[33] *Id.* ¶ 46; Aronstam Aff. Ex. O, at 2 (Mar. 26, 2018 Special Committee minutes).

[34] Compl. ¶ 47; *see* also Proxy 19 (referencing discussions between Jefferies and BMO occurring from "time to time throughout 2018" and in "early February 2019").

[35] Compl. ¶ 47.

In early February 2019, Mr. Steinberg and Richard Handler, chief executive officer of Jefferies, met with a representative of BMO. The representative of BMO encouraged Jefferies to make a proposal, subject to the terms of the stockholders' agreement, whereby Jefferies would acquire all of the shares of HomeFed common stock that it did not already own for an exchange ratio of two shares of Jefferies common stock for each share of HomeFed common stock and indicated that BMO would support such a transaction. The representative of BMO also asked Mr. Steinberg if he, in his personal capacity as a beneficial owner of HomeFed common stock, would also support such a transaction, and Mr. Steinberg said he would. The representative of BMO also indicated that he had been in contact with a representative of an investment adviser firm that advised accounts holding a substantial number of shares of HomeFed common stock, which we refer to as Advisor A, and the representative of Advisor A indicated that Advisor A, too, would support such a transaction.[36]

On February 13, 2019, the Special Committee first learned about these discussions between Jefferies and BMO.[37] At a meeting of the Special Committee, Lobatz and Considine "indicated that, to their knowledge, the Board had taken no action to dissolve the Special Committee or to modify the December 11, 2017 Authorizing Resolutions."[38] The Special Committee then directed Sheppard Mullin to request more information about Jefferies' discussions with BMO and to ask Jefferies' counsel to "remind all of the members of the Board who are also officers

---

[36] Proxy 19; *see also* Compl. ¶ 50; Aronstam Aff. Ex. A, at 1.

[37] Compl. ¶ 48.

[38] Aronstam Aff. Ex. P (Feb. 13, 2019 Special Committee minutes), at 2.

or directors of Jefferies that the Special Committee expects they will abide by the December 11, 2017 Resolutions for so long as they are in effect."[39]

On February 15, 2019, Sheppard Mullin informed the Special Committee that Jefferies had indeed been in discussions with BMO and not only would BMO support a 2:1 transaction, but also "someone that advises a significant number of holders of HomeFed shares . . . would be supportive and recommend in favor of such a transaction."[40] The "someone" was RBC Capital Markets ("RBC"), which is referred to as "Adviser A" in the Proxy. BMO and RBC together represented approximately 70% of the shares of HomeFed unaffiliated with Jefferies.[41]

### E. The February 2019 Offer

On February 19, 2019, Jefferies issued a press release announcing its proposal to acquire all remaining HomeFed common stock in exchange for two shares of Jefferies stock (the "February 2019 Offer").[42] The next day, on February 20, Jefferies filed an amendment to its Schedule 13D announcing the February 2019 Offer. The amendment stated that the February 2019 Offer "will include a condition that the proposed transaction will require the approval of a majority of the outstanding shares of [HomeFed]'s Common Stock not already owned by Jefferies

---

[39] Compl. ¶ 49 (quoting Feb. 13, 2019 Special Committee minutes).

[40] *Id.* ¶ 50.

[41] *See id.* ¶¶ 96-97; Proxy 25.

[42] Compl. ¶ 52.

(or its affiliates)" and that "[i]t is anticipated that the proposed transaction will be considered by a Special Committee of the Company's Board of Directors, comprised of Independent Directors of the Company's Board, whose affirmative recommendation to the Company's Board of Directors will be required under the . . . Stockholders Agreement."[43]

On February 20, 2019, the Special Committee held a meeting to discuss the February 2019 Offer.[44] Shepherd Mullin reported that Jefferies "was in favor of reauthorization [of the Special Committee] but would recommend that the reauthorization resolutions make clear the ability of Joseph Steinberg (and potentially other representatives of Jefferies) to speak with HomeFed minority stockholders."[45] The Special Committee rejected this recommendation and reiterated that "the Committee desires to control communications with the Corporation's minority stockholders."[46]

On February 25, 2019, during a Special Committee meeting, Shepherd Mullin informed the Special Committee members that the Board would "reauthorize" the Special Committee with the same power and authority as previously adopted in the

[43] Aronstam Aff. Ex. B (Feb. 20, 2019 Jefferies Schedule 13D/A), at 3.

[44] Aronstam Aff. Ex. R (Feb. 20, 2019 Special Committee minutes), at 2.

[45] Compl. ¶ 54 (quoting Feb. 20, 2019 Special Committee minutes).

[46] Compl. ¶ 55; Aronstam Aff. Ex. R, at 2.

December 2017 Resolutions.[47]   Shortly after the Special Committee meeting, the Board met and unanimously approved a resolution that "confirms that the Special Committee . . . is authorized to take any and all actions, and to exercise all of the authority, granted to [it] in the resolutions of the Board of Directors dated as of December 11, 2017."[48]

During the February 25 Board meeting, Steinberg provided the Board with an overview of events occurring since receipt of the Considine Letter, including his discussions with Lyman Delano of BMO over the past year.[49]   With respect to his most recent discussions, the Special Committee minutes state that:

> Within the last two weeks, Mr. Delano met with Mr. Steinberg and Richard Handler, Jefferies' CEO.  Mr. Delano said he would support a 2-for-1 deal and asked Mr. Steinberg if he as a major holder would also.  Mr. Steinberg said yes.  Mr. Delano also confirmed that another major shareholder similarly would be supportive.  Given this encouragement, Jefferies' officers sought and received approval of its board and made public its proposal.[50]

The minutes also reflect that, after Steinberg summarized his discussion with BMO, both Considine and Lobatz essentially equated Jefferies' proposal to the one Considine proposed to Steinberg in September 2017:

> Messrs. Considine and Lobatz thanked Mr. Steinberg for persevering along the lines expressed by Mr. Considine and for leading the effort to

---

[47] Compl. ¶ 56; Aronstam Aff. Ex. II, at 1.

[48] Compl. ¶ 58; Aronstam Aff. Ex. A (Feb. 25, 2019 Board minutes), at 2.

[49] Compl. ¶ 58.

[50] Aronstam Aff. Ex. A, at 1.

13

make a proposal that the Special Committee can consider along with its counsel and financial advisors. Mr. Lobatz also commended Mr. Considine for writing the September 26, 2017 letter and initiating the potential transaction.[51]

Steinberg then agreed he would "not have substantive communications with shareholders without clearing such communications with the Special Committee until definitive agreements are reached or until the potential transaction is abandoned."[52]

**F.    Negotiations in Response to the February 2019 Offer**

In March 2019, the Special Committee formally engaged Houlihan as its financial advisor and began evaluating the February 2019 Offer.[53] In evaluating the value of Jefferies, the Special Committee exclusively relied on Jefferies' trading price.[54] Houlihan did not conduct any other analysis of Jefferies' value or consider projections of Jefferies' future performance.[55]

During a March 15 meeting of the Special Committee, Lobatz reported that a HomeFed stockholder contacted him to convey that the stockholder did not think the 2:1 ratio was fair.[56] On March 18, the Special Committee asked Houlihan to reach

---

[51] *Id.* at 2.

[52] Compl. ¶ 56; Aronstam Aff. Ex. A, at 2.

[53] Compl. ¶ 64.

[54] *Id.* ¶ 68.

[55] *Id.*

[56] *Id.* ¶ 67.

14

out to BMO without informing Jefferies.[57]  BMO later confirmed to Houlihan Steinberg's account of their conversations since the Considine Letter and expressed that although BMO "believed the proposal . . . was 'inadequate,'" BMO "understood Jefferies' position and believed that such proposal was superior to the status quo."[58] Houlihan also reached out to other significant minority stockholders, which expressed similar concerns.  Specifically, Houlihan reported that RBC, which advised holders of approximately 750,000 HomeFed shares, was "begrudgingly supportive" and was concerned about Jefferies stock price decreasing.[59]

On March 25, 2019, the Special Committee decided to propose a $42 fixed value counteroffer to the February 2019 Offer.[60]  The next day, Hallac emailed Considine and Lobatz to see if one of them could speak over the phone regarding a question about the Special Committee's counteroffer.[61]  When Considine called Hallac, he sought approval for Jefferies' CEO to contact BMO to discuss the counteroffer.[62]  After Considine told Hallac he did not object, Jefferies' CEO (Richard Handler) immediately reached out to BMO without any input from

---

[57] *Id.* ¶ 73; Aronstam Aff. Ex. W, at 3.

[58] Compl. ¶ 75.

[59] *Id.* ¶ 76.

[60] *Id.* ¶ 77; Aronstam Aff. Ex. Y, at 2-3.

[61] Compl. ¶ 79.

[62] *Id.* ¶ 80.

Lobatz.[63]  In his discussions with BMO, Handler did not tell BMO about the Special Committee's proposal of a fixed value structure at $42 per share and instead implied that the 2:1 fixed exchange ratio was a "take it or leave it" proposition.[64]  BMO preferred this proposal to the status quo and thus expressed support.[65]

When Lobatz learned that Jefferies had spoken with BMO, he immediately contacted Hallac to make clear that he did not consent to Jefferies speaking directly to BMO.[66]  At the next Special Committee meeting on March 26, 2019, which occurred later in the day after Handler spoke to BMO, the Special Committee discussed its concerns about its "continued effectiveness" in light of Jefferies' behavior.[67]  Specifically, the Special Committee directed Sheppard Mullin to communicate to Jefferies that "there should be no further contact from anyone affiliated with Jefferies with any stockholder of the corporation not affiliated with Jefferies without Committee approval, which would occur only after the Committee had consulted with its legal and financial advisors."[68]

---

[63] *Id.* ¶¶ 80-81.

[64] *Id.* ¶ 81.

[65] *Id.*

[66] *Id.* ¶ 84.

[67] *Id.* ¶ 85.

[68] *Id.*

On March 27, 2019, Jefferies rejected the Special Committee's $42 fixed value counteroffer and reiterated its offer at 2:1 fixed exchange ratio.[69] Hallac communicated that Jefferies rejected the counteroffer based on the 2:1 exchange ratio proposed in the Considine Letter and BMO's support for the 2:1 exchange ratio.[70]

Later on March 27, at a meeting of the Special Committee, Lobatz reiterated his displeasure with Jefferies' conversations with BMO, which he considered "so damaging to the Committee's negotiating position" that he and Considine "discussed excluding BMO from the majority of the minority stockholder vote."[71] The Special Committee ultimately decided against taking this action.[72]

On April 2, 2019, the Special Committee agreed to Jefferies' 2:1 exchange ratio but proposed a collar with a low threshold of $38 and a high threshold of $42 to protect against a decrease in Jefferies' stock price.[73] Jefferies agreed to this structure, which was documented in a merger agreement HomeFed and Jefferies entered into on April 12.[74]

---

[69] *Id.* ¶ 88; Aronstam Aff. Ex. AA, at 1.

[70] Compl. ¶ 88.

[71] *Id.* ¶ 89.

[72] *Id.* ¶ 92.

[73] *Id.* ¶ 91.

[74] *Id.* ¶¶ 92-93. Specifically, the April 12 merger agreement provided that minority stockholders would receive their choice of either $38 per share in cash or no more than two shares of Jefferies stock and, if Jefferies stock was worth more than $21 per share when

17

## G.    Stockholders Renegotiate the Transaction Directly with Jefferies

On April 15, 2019, HomeFed and Jefferies publicly announced the terms of April 12 merger agreement, to which BMO and RBC promptly expressed their opposition to the $42 upper collar.[75] On April 16, the Special Committee decided to permit Jefferies to communicate directly with BMO and RBC about their concerns but only after Houlihan spoke to them first.[76]

The following week, the Special Committee spoke with RBC, which expressed concerns about the upper collar and that "any cash option was not attractive."[77] RBC claimed to speak for BMO as well, which meant it was relaying the views of more than 70% of the HomeFed shares not affiliated with Jefferies.[78]

On April 27, 2019, the Special Committee proposed removing the upper collar.[79] Jefferies rejected the proposal unless the $38 cash alternative also was removed, to which the Special Committee agreed on April 29, 2019.[80]

---

the Transaction closed, the exchange ratio would reduce from 2:1 to ensure that the Jefferies stock the HomeFed minority stockholders received would not be worth more than $42 in total.  *Id.* ¶ 93.

[75] *Id.* ¶ 94.

[76] *Id.* ¶ 94; Aronstam Aff. Ex. EE, at 2.

[77] Compl. ¶ 97.

[78] *Id.*

[79] *Id.* ¶ 98.

[80] *Id.* ¶¶ 98-99; Aronstam Aff. Ex. FF, at 1.

On May 2, 2019, the Special Committee and the Board approved an amendment to the merger agreement to remove the upper collar and cash option.[81] The minority stockholders voted to approve the Transaction on June 28, 2019.[82]

## II. PROCEDURAL HISTORY

On August 1, 2019, Plaintiffs filed this action, which was consolidated with a related action on September 3, 2019.[83] On September 16, 2019, Plaintiffs designated the Verified Class Action Complaint (as defined above, the "Complaint") as the operative complaint.[84]

The Complaint asserts two claims. Count I asserts a breach of fiduciary duty claim against the seven individual defendants for agreeing to the Transaction that provided the minority stockholders "unfairly low consideration for their shares of HomeFed common stock."[85] Count II asserts a breach of fiduciary duty claim against Jefferies as HomeFed's controlling stockholder for devising and orchestrating "the unfair and self-dealing Transaction."[86]

---

[81] Compl. ¶ 100; Aronstam Aff. Ex. GG.

[82] Aronstam Aff. Ex. HH (June 28, 2019 HomeFed Form 8-K), at 3. Of the 3,772,780 shares of HomeFed stock held by the Company's minority stockholders, 2,987,231 shares voted for the Transaction, 73,974 shares voted against the Transaction, and 1,476 shares abstained. *Id.*

[83] Dkt. 11.

[84] Dkt. 19.

[85] Compl. ¶ 135.

[86] *Id.* ¶ 139.

19

In November 2019, each of the Defendants moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.[87] On December 17, 2019, the parties stipulated to the dismissal of Considine and Lobatz without prejudice.[88] After briefing, the court held oral argument on April 3, 2020.

## III. ANALYSIS

The standards governing a motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[89]

The Jefferies Defendants' sole argument for dismissal of the claims against them is that the Transaction is subject to business judgment review because the Transaction complied with the framework set forth in *Kahn v. M & F Worldwide Corp.* ("*MFW*").[90] The remaining two defendants (Borden and Bienvenue) join in the *MFW* argument and advance one additional argument, *i.e.*, that the Complaint fails to plead a non-exculpated claim against them under *In re Cornerstone*

---

[87] Dkt. 24; Dkt. 25.

[88] Dkt. 32.

[89] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotations and citations omitted).

[90] 88 A.3d 635 (Del. 2014).

20

*Therapeutics Inc., Shareholder Litigation.*[91]  The court addresses each issue in turn below.

### A.    The *MFW* Defense

In *MFW*, our Supreme Court held that the business judgment rule is the appropriate standard of review for a challenge to a squeeze-out merger by a controlling stockholder if the transaction satisfies certain procedural protections:

> We hold that business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders.[92]

The high court reasoned that the "simultaneous deployment of [these] procedural protections . . . create a countervailing, offsetting influence of equal—if not greater—force" than the undermining influence of a controller.[93]  In this way, the "controller irrevocably and publicly disables itself from using its control to dictate the outcome of the negotiations."[94]

---

[91] 115 A.3d 1173 (Del. 2015).

[92] 88 A.3d at 644.

[93] *Id.*

[94] *Id.*

In summarizing its holding, the Supreme Court in *MFW* identified six conditions that must be satisfied to invoke business judgment review of a squeeze-out merger by a controlling stockholder:

> [I]n controller buyouts, the business judgment standard of review will be applied *if and only if*: (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[95]

"If a plaintiff can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist," the plaintiff would state a claim for relief and be entitled to conduct discovery.[96] "If, after discovery, triable issues of fact remain about whether either or both of the dual procedural protections were established, or if established were effective, the case will proceed to a trial in which the court will conduct an entire fairness review."[97]

Plaintiffs contend that entire fairness review presumptively applies to the Transaction because the Complaint's factual allegations support more than a reasonable inference that three of the six conditions required under *MFW* were not

---

[95] *Id.* at 645 (formatting altered), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754, 763 (Del. 2018).

[96] *Id.*

[97] *Id.* at 645-46.

satisfied. For the reasons discussed next, the court concludes that Plaintiffs have plead a reasonably conceivable set of facts that Jefferies did not impose the *MFW* conditions *ab initio* based on the Complaint's allegations concerning Jefferies' discussions with BMO before Jefferies made the February 2019 Offer.[98]

Plaintiffs contend that adherence to the *MFW* framework required imposition of its dual protective devices in 2017, after Considine sent Steinberg a letter proposing a potential merger of HomeFed and Jefferies based on a 2:1 exchange ratio. According to Plaintiffs, the Considine Letter led to a continuous series of substantive negotiations concerning a potential transaction that Jefferies had *before* it committed to the *MFW* framework, first with the Special Committee from December 2017 to March 2018 and then directly with BMO from March 2018 to February 2019.

Relying on this court's decision in *In re Books-A-Million, Inc. Stockholders Litigation*,[99] Defendants counter that the process with the Special Committee that began in December 2017 ended in March 2018, when Jefferies abandoned pursuit of a transaction, and that the February 2019 Offer began a separate process. As to the

---

[98] Given the court's conclusion on this issue, it not necessary to address the two other *MFW* conditions that Plaintiffs contend were not satisfied, namely that "the Special Committee was neither well-functioning nor an effective negotiating agent" and that the "Proxy was materially incomplete and misleading." Pls.' Answering Br. 25 (Dkt. 33).

[99] 2016 WL 5874974, at *8 (Del. Ch. 2016), *aff'd*, 164 A.3d 56 (Del. 2017) (quoting *MFW*, 88 A.3d at 644).

second process, Defendants contend that Jefferies satisfied the *MFW* pre-condition requirement on the theory that the Stockholders Agreement provided the "rules of the road . . . for any potential going-private transaction with Jefferies."[100] They further contend this requirement was met because, "within days of Jefferies informing Lobatz and Considine about BMO's support for a potential two-for-one transaction in February 2019, and before Jefferies made the [February 2019 Offer], Jefferies made clear that it expected any transaction to comply with *MFW*'s strictures and the Stockholders Agreement."[101]

As an initial matter, Defendants' reliance on *Books-A-Million* is misplaced. There, this court found it was not reasonably conceivable that a proposal from a controller made "nearly three years after" a special committee rejected an initial proposal from the controller containing "a different price and different terms" was a continuation of the first proposal.[102] Here, by contrast, the Complaint alleges that:

- The Board never repealed the December 2017 Resolutions or dissolved the Special Committee;

- As reflected in its minutes and the Proxy, the Special Committee only "determined to *pause* its process" in March 2018 when Jefferies indicated it no longer wanted to pursue a transaction;

- Despite asserting a lack of interest in a transaction in March 2018, Jefferies "repeatedly" held substantive economic discussions

---

[100] Jefferies Opening Br. 33 (Dkt. 24).

[101] *Id.*

[102] *Books-A-Million*, 2016 WL 5874974, at *9.

24

concerning a potential transaction over the next eleven months with the Company's largest minority stockholder (BMO) notwithstanding the fact that the December 2017 Resolutions gave the Special Committee the "exclusive power and authority . . . to communicate with . . . the stockholders;" and

- Those discussions culminated in BMO expressing support for a transaction with the same structure (*i.e.*, a 2:1 exchange ratio) proposed in the Considine Letter that triggered the need for the Special Committee in the first place.[103]

Given these well-plead allegations, it is reasonably conceivable that the February 2019 Offer was part of the same process that led to the adoption of the December 2017 Resolutions that empowered the Special Committee and caused it to retain multiple legal advisors shortly thereafter.[104]  That process failed to comply with the *MFW* framework because Jefferies did not condition a transaction *ab initio* upon the dual *MFW* protections before that process began.

---

[103] Compl. ¶¶ 38, 46-48 (emphasis in original); Aronstam Aff. Ex. O (Mar. 26, 2018 Special Committee minutes); Aronstam Aff. Ex. P (Feb. 13, 2019 Special Committee minutes); Proxy 19; December 2017 Resolutions at -1381.

[104] Defendants ask the court to draw inferences in their favor to find that the Special Committee process that began in December 2017 ended in March 2018 because Considine and Lobatz sought "reauthorization" from the Board after receiving the February 2019 Offer and because they declined to engage Houlihan formally until the Board approved the reauthorization.  Jefferies Opening Br. 37, 43.  This would be inappropriate.  The court may not weigh evidence on a motion to dismiss to resolve a factual dispute.  Rather, the court's task is to determine whether plaintiff would be entitled to recover "under any reasonably conceivable set of circumstances" while drawing "all reasonable inferences in favor of the non-moving party."  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

25

Although it is reasonably conceivable that the February 2019 Offer was part of the process that began in December 2017, it ultimately makes no difference in my opinion whether it was or whether the February 2019 Offer triggered a new process. This is because, in either case, Jefferies did not commit to the *MFW* protections before engaging in substantive economic discussions concerning the Transaction. Rather, Jefferies engaged in a series of discussions with BMO until Jefferies received an indication of support for a 2:1 share exchange from BMO—whose support was essential to get a deal done with minority stockholder approval[105]—as well as from RBC *before* Jefferies agreed to the dual *MFW* protections. To be more specific, Jefferies received these indications of support in early February 2019 but did not agree to the *MFW* protections until, at the earliest, February 20, 2019, when it amended its Schedule 13D.[106] Defendants advance essentially two arguments why this should not matter. Neither has merit.

---

[105] Mot. to Dismiss Hr'g Tr. 27 (Apr. 3, 2020) (Dkt. 47) (Jefferies Defendants' counsel: "the reality is that BMO, owning 9 percent of the stock – which, in fact, translated into 36 percent of the minority – no deal was ever going to get done without BMO's interest and support.").

[106] *See supra* Part I.E. Jefferies appears to argue it agreed to the *MFW* protections a few days earlier, on February 18. That is when its counsel confirmed to Shepherd Mullin the details of Steinberg's discussions with BMO and "indicated that any transaction would be subject to the approval of the Special Committee and a majority of the outstanding shares of the Corporation's Common Stock not already owned by Jefferies or its affiliates." *See* Jefferies Opening Br. 13-14 (quoting Feb. 18, 2019 Special Committee minutes), 33. But this was not a public commitment to the *MFW* protections and, in any event, the key discussion with BMO occurred before February 18. *See* MFW, 88 A.2d at 644 ("[W]here the controller irrevocably and *publicly* disables itself from using its control to dictate the outcome of the negotiations and the shareholder vote, the controlled merger then acquires

First, Defendants contend the Stockholders Agreement "all but eliminated the risk of Jefferies pursuing a going-private transaction without the support of HomeFed's independent directors and minority stockholders."[107] This is incorrect. The requirement in the Stockholders Agreement for approval of a majority of the minority stockholders only applies to transactions subject to Rule 13e-3 of the Exchange Act.[108] The Stockholders Agreement thus did not preordain that any buyout of HomeFed's minority stockholders would be subject to a majority of the minority approval requirement. Indeed, it appears that the Transaction fell within an exception to Rule 13e-3 because HomeFed stockholders received "only an equity security" (*i.e.*, Jefferies stock) that carried substantially the same rights as HomeFed stock.[109] Jefferies does not contend otherwise.

Second, Defendants argue that Jefferies' discussions with BMO before the February 2019 Offer did not pass the point of no return for invoking *MFW*'s protections because those discussions were "preliminary" and only involved "an

---

the shareholder protective characteristics of third-party, arm's-length mergers, which are reviewed under the business judgment standard.") (emphasis added).

[107] Jefferies Reply Br. 20 (Dkt. 36).

[108] *See supra* Part I.B.

[109] *See* Pls.' Answering Br. 27 n.31 (citing 17 CFR § 240.13e-3(g)(2)).

unaffiliated minority stockholder with no ability or authority to bind the corporation or any other stockholder."[110] The court disagrees.

"The first requirement of [*MFW*] is that the controller condition the transaction '*ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders.'"[111] "[T]he purpose of the words '*ab initio*,' and other formulations like it in the *MFW* decisions, require the controller to self-disable before the start of substantive economic negotiations, and to have both the controller and Special Committee bargain under the pressures exerted on both of them by these protections."[112]

As this court recently explained in *In re Dell Technologies Inc. Class V Stockholders Litigation*, "*MFW's* dual protections contemplate that the Special Committee will act as the bargaining agent for the minority stockholders, with the minority stockholders rendering an up-or-down verdict on the committee's work."[113] A special committee is uniquely qualified to perform this task because directors have "superior access to internal sources of information," can deploy "the Board's statutory authority under Section 141(a) as delegated to the committee under Section

[110] Jefferies Opening Br. 39-40.

[111] *In re Books-A-Million,* 2016 WL 5874974, at *8 (quoting *MFW*, 88 A.3d at 644).

[112] *Synutra*, 195 A.3d at 763.

[113] 2020 WL 3096748, at *17 (Del. Ch. June 11, 2020).

28

141(c), and can 'act as an expert bargaining agent.'"[114] Directors also owe fiduciary duties and do not suffer from the collective action problem of disaggregated stockholders whereas minority stockholders are unencumbered by fiduciary duties (absent special circumstances) and "may have divergent interests in a transaction, whether economic or otherwise."[115]

Here, the Complaint sufficiently alleges that, by engaging in substantive economic discussions with BMO before committing itself to the twin *MFW* protections, Jefferies failed to disable and subject itself to the pressures of negotiating with the Special Committee with those protections in place. Instead, according to the Complaint, Jefferies anchored the negotiations and undermined the Special Committee's ability to bargain effectively as the minority stockholders' agent. To that end, the Complaint specifically alleges that Jefferies cited BMO's support for a 2:1 exchange ratio when it rebuffed the Special Committee's $42 fixed value counteroffer.[116]

---

[114] *Id.* (quoting *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 618 (Del. Ch. 2005); *see* 8 *Del. C.* § 141.

[115] 2020 WL 3096748, at *18 (citations omitted).

[116] Compl. ¶ 88 (alleging that "Jefferies only received" the "purported support of BMO for a 2:1 exchange ratio" that Hallac stated was one of "the bases for Jefferies' decision to reject" the Special Committee's counteroffer by "repeatedly violating the [December 2017] Resolutions to pressure and deceive BMO into agreeing to an unfair Transaction"). *See also id.* ¶ 89 (Lobatz complaining that Jefferies' March 2019 conversations with BMO damaged the Special Committee's "negotiating position" to the point that "the Special Committee discussed excluding BMO from the majority-of-the-minority stockholder vote").

Defendants' contention that Jefferies' discussions with BMO were simply "preliminary" is inconsistent with well-plead allegations that those discussions concerned the key economic term of the Transaction—the price. Although the value realized from a pure share exchange is inherently subject to the relative prices of the underlying shares of stock in the exchange, one would be hard-pressed not to view the exchange ratio as an important substantive economic term. In fact, the 2:1 ratio to which BMO indicated support just days before Jefferies purported to commit itself to the *MFW* protections ultimately dictated the final price HomeFed's minority stockholders received for their shares in the Transaction a few months later.

Finally, Defendants' position implies that substantive economic discussions *preceding* invocation of *MFW*'s twin protections should not preclude a pleading-stage dismissal under *MFW* if they occur between the controller and a minority stockholder with no authority to bind the company as opposed to an authorized representative of the controlled company. Neither party identified any legal authority addressing this precise scenario. In *Dell*, the court held that defendants were not entitled to receive a pleading-stage dismissal under *MFW* where the controller bypassed the special committee in favor of direct negotiations with stockholders *after* invoking *MFW*'s protections.[117]

---

[117] *Dell*, 2020 WL 3096748, at *19-20.

30

As previously mentioned, the animating principle of *MFW* is to require a controller to disable and negotiate with an independent and adequately empowered committee of directors under the pressures of the dual protections. If the controller does so in accordance with the six conditions enumerated in *MFW*, the controller effectively will secure a pleading-stage dismissal of a case that otherwise would be subject to entire fairness review.[118] To my mind, it would be imprudent to endorse a rule that would allow a controller to undermine the effectiveness of a special committee preemptively through direct negotiations with a stockholder under the circumstances plead here as much as it would be to do so after the committee has been authorized formally.

For the reasons explained above, the court denies Defendants' motion to dismiss both claims in the Complaint based on their *MFW* defense. Accordingly, Plaintiffs are entitled to proceed to take discovery.[119]

---

[118] *See id.* at \*14 (explaining that the business judgment rule resulting from application of *MFW* is essentially "irrebuttable" because "[i]t is 'logically difficult to conceptualize how a plaintiff can ultimately prove a waste or gift claim in the face of a decision by fully-informed, uncoerced, independent stockholders to ratify the transaction'") (quoting *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999)).

[119] *MFW*, 88 A.3d at 645 ("If a plaintiff that can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist, that complaint would state a claim for relief that would entitle the plaintiff to proceed and conduct discovery.").

## B. The *Cornerstone* Defense

Defendants Bienvenue and Borden are protected by a Section 102(b)(7) provision in HomeFed's certificate of incorporation.[120] "When a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[121] For the reasons discussed next, Plaintiffs have plead facts supporting a rational inference that, by voting to approve the Transaction, Bienvenue and Borden acted to advance the self-interest of an interested party (Jefferies) that stood on both sides of the Transaction from which they could not be presumed to act independently.

---

[120] Transmittal Affidavit of Alexandra Cumings Ex. 1, § 8 (Dkt. 26). "The court may take judicial notice of an exculpatory charter provision in resolving a motion addressed to the pleadings." *McMillan v. Intercargo Corp.*, 768 A.2d 492, 501 n.40 (Del. Ch. 2000). Plaintiffs assert in a footnote that Borden cannot secure dismissal under Section 102(b)(7) because he was an officer of the Company in addition to being a director, but Plaintiffs fails to allege any facts demonstrating that Borden took any action in this capacity relevant to Count I. *See Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1288 (Del. 1994) (finding that a breach of fiduciary duty claim against a dual director-officer asserted "in his role as an officer" "lacks merit" where plaintiff "failed to highlight any specific actions [the officer-director] undertook as an officer (as distinct from actions as a director)" so as to fall outside of Section 102(b)(7)'s protection).

[121] *In re Cornerstone*, 115 A.3d at 1179-80.

With respect to Bienvenue, the Complaint alleges he served in a variety of executive roles for Jefferies from January 1996 until April 2011, and has served on the HomeFed Board since 1998.[122] In addition to his continued service on the Board, Bienvenue provided paid consulting services to HomeFed for several years and as recently as the first quarter of 2019. More specifically, Plaintiffs allege that, aside from his HomeFed director role, Bienvenue's consulting role was his "sole employment" and he received approximately $10,000, $39,000, $155,000, and $50,000 in consulting fees from HomeFed for 2016, 2017, 2018, and the first quarter of 2019, respectively.[123] Even under the more onerous particularity pleading standard of Rule 23.1, this court has found that a "consulting agreement suggests a lack of independence."[124]

Turning to Borden, the Complaint alleges he was a Jefferies Vice President from August 1988 to October 2000, served as HomeFed's President for twenty years from May 1998 to February 2018, and was serving as Vice Chairman of the

[122] Compl. ¶ 20.

[123] *Id.*; HomeFed 10-Q, filed with the SEC on May 9, 2019, at 16, 28. The court may take judicial notice of this fact because it is not subject to reasonable dispute between the parties. *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) ("[I]n acting on a Rule 12(b)(6) motion to dismiss, trial courts may consider hearsay in SEC filings to ascertain facts appropriate for judicial notice under Delaware Rule of Evidence 201. . . [however] it [can] only take judicial notice of facts not subject to reasonable dispute.") (internal quotation marks, alterations, and citations omitted).

[124] *Orman v. Cullman*, 794 A.2d 5, 30 (Del. Ch. 2002) (finding it "reasonable to infer that $75,000 would be material" to the director in question and that he would be "beholden to the controlling shareholders for future renewals of his consulting contract.").

33

Company—an executive officer position—under an employment agreement when the Transaction was approved.[125] "Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller."[126] Borden also was not listed as "independent" under Nasdaq listing rules in HomeFed's 2018 Proxy.[127]

The Complaint also alleges that the members of the Special Committee recognized Bienvenue and Borden's lack of independence from Jefferies in 2017 when a Jefferies buyout of the minority stockholders was first proposed. Specifically, Considine and Lobatz wrote a letter to the Board in December 2017 stating that, "*as the only independent directors*, we would like to request that you . . . appoint [us] to investigate a potential stock transaction acting as an independent special committee."[128] When they sent this letter, Considine and Lobatz had served on the Board together with Bienvenue and Borden for nearly twenty years

---

[125] Compl. ¶ 21; Proxy 42 ("No executive officer is a party to any employment agreement other than Paul J. Borden."); HomeFed Schedule 14A, filed with the SEC on June 28, 2018, at 13 ("As Vice Chairman, Mr. Borden remains an executive officer of the Company and it is expected that he will continue his service through December 31, 2019.").

[126] *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *35 (Del. Ch. Jan. 25, 2016) (collecting authorities).

[127] Compl. ¶ 21.

[128] *Id.* ¶ 37 (emphasis added).

and were well-positioned to understand the work Bienvenue and Borden did for HomeFed and the relationship they had with Jefferies.[129]

Bienvenue and Borden argue that the December 2017 letter is "immaterial" because it does not speak to their independence when they approved the Transaction in May 2019.[130] As discussed above, however, Plaintiffs allege that Bienvenue and Borden continued to serve as a consultant and officer of HomeFed, respectively, throughout 2018 and into 2019, similar to when their fellow directors (Considine and Lobatz) did not view them to be independent in December 2017.

Bienvenue and Borden also contend that Plaintiffs' allegations primarily concern their ties to HomeFed and have no bearing on their ties to Jefferies. This argument ignores the indisputable reality that Jefferies controlled HomeFed for several years leading up to the Transaction. As this court discussed in *In re BGC Partners, Inc.*, "our law is not blind to the practical realities of serving as a director of a corporation with a controlling stockholder."[131] Indeed, "Delaware Supreme Court decisions have recognized the risk that directors laboring in the shadow of a controlling stockholder face a threat of implicit coercion because of the controller's ability to not support the director's re-nomination or re-election, or take the more

---

[129] *Id.* ¶¶ 20-23.

[130] Bienvenue and Borden Reply Br. 9-10 (Dkt. 37).

[131] 2019 WL 4745121, at *7 (Del. Ch. Sept. 30, 2019).

aggressive step of removing the directors."[132] Although the presence of a controller does not alone overcome the presumption of director independence, it is relevant when considering Plaintiffs' allegations holistically.

Here, when viewed collectively, the Complaint's allegations show that when Borden and Bienvenue cast their votes—which were essential to secure approval of a transaction benefitting the controller (Jefferies)[133]—(i) Borden was simultaneously serving as an executive officer of the controlled company (HomeFed); (ii) Bienvenue had been receiving consulting fees from HomeFed as his sole employment apart from serving as a HomeFed director for years and as recently as about one month earlier; and (iii) two of their fellow directors had questioned their independence. Accepting the well-plead allegations of the Complaint as true and drawing all reasonable inferences in favor of Plaintiffs as the court must under Rule 12(b)(6), the Complaint supports a rational inference that Bienvenue and Borden could not be presumed to act independently from Jefferies and acted to support its self-interest by approving the Transaction.[134]

---

[132] *In re Ezcorp*, 2016 WL 301245, at *20 (citing *Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1116-17 (Del. 1994); and *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997)).

[133] It is reasonable to infer that the affirmative votes of Bienvenue and/or Borden were essential to approve the Transaction given that three of the seven members of the Board (Steinberg, Friedman, and Hallac) "abstained from voting due to their affiliation with Jefferies." Proxy 26.

[134] Bienvenue and Borden argue that the Complaint fails to state a non-exculpated claim against them based on the court's analysis in *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL

36

## IV. CONCLUSION

For the reasons explained above, the Defendants' motions to dismiss are denied.

**IT IS SO ORDERED.**

6719717 (Del. Ch. Dec. 19, 2018). *Klein* involved three inter-related transactions: (i) HIG's sale of its 54% interest in Surgery Partners, Inc. to an affiliate of Bain, (ii) Surgery Partners' acquisition of another company from a third party, and (iii) Surgery Partners' issuance of preferred stock to Bain. *Id.* at *1. The court found that the complaint raised a reasonable doubt concerning the independence of one director (Doyle) for purposes of determining demand futility but that "no facts [were] alleged in the Complaint specific to Doyle that indicate that he advanced HIG's self-interest as plaintiff theorizes" so as to state a non-exculpated claim against him. *Id.* at * 11-12, 18. Here, the Complaint not only pleads facts that call into question Bienvenue's and Borden's independence from Jefferies, but alleges that they approved the Transaction in breach of their fiduciary duties in order to facilitate Jefferies' purchase of the minority stockholders' shares for "unfairly low consideration." *See* Compl. ¶¶ 133-35.